# MICHIGAN CONDENSED MILK COMPANY *v.* KEN-NEWEG COMPANY.

TRADEMARKS; EVIDENCE; CONTRACTS; LACHES; ESTOPPEL.

1. Where, in a controversy between a manufacturer and a dealer in condensed milk, the only support of a claim by the former of the existence of an agreement by which the latter was to have the exclusive right to sell a given brand of milk in a certain locality was a sentence in a letter written to the dealer, stating that "we expected you to have a large sale in this brand, as you have the exclusive control of it in your city,"—which statement was not disputed by the dealer in his reply to the letter,—it was *held* that, under circumstances showing that the dealer might not have attached any significance to the words, the agreement had not been proved.

2. An opposition to registration of the figure of a star, associated with the word "star," as a trademark for a band of condensed milk, on the ground of substantial identity with opposer's trademark, is properly dismissed where it appears that the original use of the device was on condensed milk ordered by the applicant for registration, a dealer, from the opposer, a manufacturer, and so marked by the manufacturer in accordance with directions of the dealer; that subsequent shipments to the dealer were so branded, and that while dealers in other states were thereafter furnished with milk by the manufacturer, similarly branded, the applicant had no knowledge of that fact until after he had registered the milk under the then existing law.

3. Consent to the appropriation of one's trademark by another is not to be inferred from long knowledge and silence. The use of one's trademark by another is a continuing wrong, and the right to prevent its continuance can rarely be lost by mere delay of assertion. There must be some element of estoppel.

4. Mere delay on the part of the owner of a trademark to assert his right, as such, cannot be made the ground of successful opposition by an infringer to the registration of the trademark by the owner.

No. 450.  Patent Appeals.  Submitted January 21, 1908.  Decided March 3, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents dismissing an opposition to the registration of a trademark.                                *Affirmed.*

The facts are stated in the opinion.

*Mr. Joseph A. Burkart* and *Mr. Arthur P. Greeley* for the appellant.

*Mr. Edward S. Duvall, Jr.,* and *Mr. Wm. N. Moore* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

On April 17, 1905, the Kenneweg Company, a corporation doing business as wholesale grocer in Cumberland, Maryland, filed an application for the registration of a trademark consisting of a large figure of a star, in a solid color, with the words "Star Brand, Condensed Milk," arranged around it. The description and accompanying label show the words "Star" above the representation of a large five-pointed star; the word "milk" was below; the word "Brand" was on one side; and the word "condensed" on the other.

The Examiner informed the applicant that the trademark appeared to consist of the representation of the star, associated with the word "star," and that the words "condensed milk" must be canceled. These suggestions were followed by amendment of the application in conformity therewith, and the applicant was thereupon notified of the passage of the application for the required publication. Within the period prescribed by law the Michigan Condensed Milk Company filed an opposition to the registration. The substantial allegations of the opposition are that the said trademark is substantially identical with a trademark adopted by opponent in 1890 and used continuously since upon the goods manufactured and sold by it,

and is likely to be mistaken by the public for its trademark; that the trademark of opponent, adopted in 1890, was first placed upon goods manufactured by opponent and sold to the Kenneweg Company on May 19, 1891; and that opponent has never given to the Kenneweg Company any interest in said trademark, or the right to use the same.

The Kenneweg Company replied to the opposition, alleging that it had adopted the trademark in 1891; that the same had been designed by it and used on condensed milk ordered from the opponent about May 19, 1891, with the request to furnish the Star Milk and place upon the cans the label bearing the adopted mark; that the Kenneweg Company originated and adopted the trademark before entering into any arrangement with opponent; and that opponent furnished the labels from designs and drawings submitted by Kenneweg & Company; that the said trademark is the lawful property of the Kenneweg Company, and the opponent has never had the right to use the same; that the said trademark has been continuously used by the Kenneweg Company in its business since its adoption, and was registered by it April 16, 1895.

On the evidence taken, the Examiner of Interferences rendered a decision in favor of the opponent. The Kenneweg Company appealed to the Commissioner, who reversed the Examiner's decision.

The Michigan Condensed Milk Company was a large manufacturer of condensed milk in and prior to 1891. Kenneweg & Company, who were succeeded by the Kenneweg Company in its business and rights, were engaged in the wholesale grocery business in Cumberland, Maryland, in and before 1891. It appears from correspondence between the parties, some of which seems to have been lost or destroyed before the controversy began, that on April 14, 1891, Kenneweg & Company wrote to the Michigan Condensed Milk Company, asking if it could put up for them a certain sample of milk under a private brand. This was satisfactory to the Michigan Company. They wrote again on April 24, acknowledging receipt of samples, and saying: "You will please put up for us twenty-five cases at $4 f.

o. b. New York, brand it 'star,' having a large [STAR] in the label, and have the color and general printing matter resemble as nearly as possible G. B. Eagle brand." To this the Michigan Company replied under date of April 27, 1891, saying: "We have ordered the labels made, and will get them out as quick as we can get the woodcut completed. We enclose label so that you may see it. We wish to know if you want your name on the label and your street address, as it is on this one; or would you like the plain label 'Star Brand of Condensed Milk.' * * * The label will be made style of an inclosed large star in centre, Star Brand." In reply, Kenneweg & Company said: "We prefer not to have our name or address on the label, simply 'Star Brand Condensed Milk' and a large cut of a star." Kenneweg testified that he had previously sent a rough sketch of the desired mark. This was denied by the opponent's general manager, Parsons. A shipment of twenty-five cases of milk, labeled as shown, was made to Kenneweg & Company on May 19, 1891, and others thereafter during the several years that the parties did business with each other. Kenneweg testified that the figure of the star on these labels was colored red, with the surrounding words printed in blue upon white paper. The evidence on behalf of the opponent shows that Kenneweg was mistaken in the color of the star on the earlier shipments, as the labels printed at that time were entirely blue in color on white paper. It also shows that the first labels with the red star were not printed until 1893. Kenneweg may, however, have confused the labels of later shipments with those of the earlier ones, as they were identical save in the color of the representation of the star. However this may be, Kenneweg & Company continued for several years to order and sell to their customers the Star Brand Condensed Milk. Sales were made in Maryland, West Virginia, and Pennsylvania, and one case was shipped to Canada. The evidence of the Michigan Condensed Milk Company showed that on the same day that the first shipment was made to Kenneweg & Company another was made to a dealer in New Jersey having the same label. The name of the manufacturer did not appear on any of these

labels.   Other shipments were made to the New Jersey party during 1891, and some to a dealer in Boston in 1891.   Eight hundred and fifty cases in all were shipped to Kenneweg & Company after business with them commenced.   No notice was given to Kenneweg & Company of the use of the labels in shipments to others, and the fact did not become known to them until October 1895, after they had registered the trademark under the former law.   The Michigan company never applied for registration, but printed a registration number on their later labels.   This was claimed as a registration trademark in later correspondence with Kenneweg & Company after their relations became strained.   The evidence showed that this so-called registration was in the office of some trade journal in New York which registered trademarks at request of customers or subscribers.   It is a fact admitted by the Michigan company, that during the several years that it dealt with Kenneweg & Company it had shipped no milk with this label to any other dealer in the State of Maryland

The Michigan company attempted to show that it had an agreement with Kenneweg & Company by which the latter was to have the exclusive right to sell the Star Brand Milk in Cumberland and vicinity.   This, Kenneweg, as a witness, expressly denied.   As the parties had never met so as to have an oral agreement of any kind, it must have been made in writing, either through the execution of a formal agreement, or the correspondence of the parties.   No attempt was made to show that such an agreement had ever been executed, and the only thing in the correspondence suggesting it, during the time the parties were doing business with each other, was contained in a sentence in a letter written by the Michigan company to Kenneweg & Company under date of August 17, 1891.   This began with a reference to the fact that no order had been received for a long time, and the sentence referred to is this. "We expected you to have a large sale in this brand, as you have the exclusive control of it in your city."   Kenneweg & Company replied briefly, saying that milk was too abundant to sell much of the condensed

article, but expected to have usual trade for it in a month or two.

As the Michigan company was then actually selling and preparing to sell milk in large quantities under this brand, in other markets, there may or may not have been a design in this casual reference to an exclusive control in Cumberland. And Kenneweg & Company, not knowing of other sales under this label, may not have attached any significance to those words. While this reference in the letter, and Kenneweg & Company's failure to dispute it in the reply, might have become an important circumstance in corroboration of other testimony tending to show the agreement claimed, it is not sufficient, by itself, to constitute proof that an agreement in accordance with it had been previously made.

The Michigan company failed, also, to make good its allegation of adoption and use of the label before the request of Kenneweg & Company for a private brand. As stated in the letter to Kenneweg & Company before mentioned, the woodcut for printing this label was prepared thereafter. The Examiner of Interferences, who sustained the opposition on other grounds, found, as did the Commissioner, that there had been no such previous adoption of the trademark by the opposing company.

In his decision, the Examiner of Interferences stated it to be the law that "where a customer orders a manufacturer to put up goods under a certain brand which originates with the customer, that brand belongs to the customer, and not to the manufacturer." The correctness of this proposition has not been controverted. His conclusion, however, was that there was sufficient evidence to show that the Michigan company had used the brand as a trademark, and that Kenneweg & Company only had the exclusive right to sell goods with the label upon them in Cumberland and vicinity As shown hereinbefore, this conclusion was erroneous. It was not until October, 1895, about six months after the registration of the trademark, that Kenneweg & Company discovered the fact that the Michigan company had been selling and shipping milk, under this trademark, to Chicago. The later correspondence between the parties grow-

ing out of this discovery sheds no important light upon the necessary facts on which the controversy depends. It is enough to say that the Michigan company declared its original adoption of the trademark, and maintained that the sole right of Kenneweg & Company therein was to its exclusive use in Cumberland and vicinity,—a mere license,—while Kenneweg & Company asserted their own right to ownership of the trademark. The opponent having, in our opinion, failed to overcome the right of the Kenneweg Company, it remains to consider whether the latter has lost that right by its laches.

This contention is founded on the fact that the Kenneweg Company and its predecessor took no steps, after discovering the use of the trademark by the Michigan company, to prevent that use. Consent to the appropriation of his trademark by another is not to be inferred from long knowledge and silence. The use of one's trademark by another is a continuing wrong, and the right to prevent its continuance can rarely be lost by mere delay of assertion. There must be some element of estoppel. Clearly, the Kenneweg Conpany has never abandoned the trademark. It protested against its use by the Michigan company, but for some reason has never brought suit. It is well settled that delay will not prevent an injunction against an infringement, though it may have been so long continued as to deprive the complainant of his right to past damages. *McLean v. Fleming,* 96 U. S. 245, 251, 24 L. ed. 828, 830; *Menendez v. Holt,* 128 U. S. 514, 523, 32 L. ed. 526, 528, 9 Sup. Ct. Rep. 143. If mere delay would not protect an infringer from an injunction against further use of a trademark, it necessarily follows that it cannot be made the ground of successful opposition to its registration by the owner.

Being of the opinion that the Commissioner's decision was right, it will be affirmed. It is ordered, and that this decision be certified to the Commissioner of Patents as required by law.                                              *Affirmed.*